Robert YOHANNON and
Barbara Yohannon

v.

KEENE CORPORATION; GAF Corporation; Eagle–Picher Industries, Inc.; Fibreboard Corporation; Garlock, Inc.; Raymark Industries, Inc.; Delaware Insulation; Celotex Corporation; Owens–Corning Fiberglas Corporation; and Owens Illinois Glass Company

v.

PACOR, INC. and Nicolet, Inc.

Appeal of RAYMARK
INDUSTRIES, INC.

No. 88–1170.

United States Court of Appeals,
Third Circuit.

Argued Oct. 19, 1988.

Reargued July 12, 1990.

Decided Jan. 24, 1991.

As Amended Feb. 7, 1991.

James D. Coleman, (reargued), David Kedson (argued), Tyson W. Couglin, Dexter R. Hamilton, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant.

Martin Greitzer (reargued), Robert J. Gordon (argued), Jonathan W. Miller, Greitzer & Locks, Philadelphia, Pa., for appellees Robert and Barbara Yohannon.

Before BECKER, HUTCHINSON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

In this asbestos action, Raymark Industries, Inc. (Raymark or the Company), appeals a judgment of the United States District Court for the Eastern District of Pennsylvania granting Robert and Barbara Yohannon (the Yohannons) damages in the amount of $130,254.80, plus pre-judgment interest of $33,058.67, for asbestos-related injuries. The jury found that Mr. Yohannon's injuries were partly attributable to Raymark because he was exposed to the Company's asbestos products while employed at the DuPont Chambers Works plant (DuPont or the Plant) in Deepwater, New Jersey. The original complaint was filed in the United States District Court for the Eastern District of Pennsylvania against multiple defendants engaged in the manufacture, use and marketing of asbestos and asbestos products. Raymark was the only defendant that did not settle. At trial, a jury found for the Yohannons and apportioned forty percent of the gross damages against Raymark. The district court entered judgment against Raymark in accord with the jury's assessment of relative responsibility among all the original defendants.

On appeal, Raymark disputes the sufficiency of the evidence supporting certain elements of the jury's liability and damage findings. It also attacks the district court's refusal to permit one of its proposed witnesses to testify. Finally, Raymark challenges the rule of decision on pre-judgment interest. Although sitting in diversity as a Pennsylvania forum, the district court applied New Jersey law to all aspects of this case, including the computation of pre-judgment interest. This amount was determined in accord with the New Jersey court rule governing assessment of delay damages. The Company argues that the district court erred in applying New Jersey law to the issue of pre-judgment interest, since a Pennsylvania forum would have chosen to apply Pennsylvania law on pre-judgment interest, rather than the New Jersey court rule. Furthermore, Raymark argues that a Pennsylvania court would not have allowed pre-judgment interest in this case. We will affirm the district court's judgment in all respects except for its use of New Jersey law in computing delay damages. On that question, we hold that Pennsylvania law applies, that the applicable law is Pennsylvania Rule of Civil Procedure 238, that Rule 238 requires pre-judgment interest in this case and that this record presents no state or federal constitutional impediment to Rule 238's application. Therefore, we will remand this matter for the district court to compute delay damages or pre-judgment interest under the current version of Rule 238 and modify its judgment accordingly.

### I.

#### Procedural History

This suit began on October 2, 1985, when the Yohannons filed a complaint in the district court seeking damages against ten asbestos companies for asbestos-related injuries and loss of consortium. The complaint alleged that Robert Yohannon was injured by his exposure to asbestos while employed at DuPont. A jury trial began on November 9, 1987, and by the close of

the second day all defendants except Raymark had settled. On November 13, 1987, the jury found in favor of the Yohannons and determined that they had suffered $344,000 in total damages. The jury, through its answers to interrogatories, separated the damage award into five parts: (1) Past Lost Wages—$70,000; (2) Future Lost Wages—$126,000; (3) Past and Future Medical Expenses—$75,000; (4) Pain and Suffering—$60,000; and (5) Loss of Consortium—$13,000. The jury found that Mr. Yohannon would have continued to work for at least four and one-half more years if he had not been exposed to asbestos, and that the average rate of interest over that period would have been six percent. The jury apportioned forty percent of the liability against Raymark and sixty percent among six of the other original defendants whose asbestos products were also used at DuPont. *See* Appellant's Appendix (App.) at 622–26. On November 17, 1987, the district court entered judgment against Raymark on the jury verdict for $130,254.80, representing forty percent of the total damage award. *Id.* at 646.

On November 16, 1987, the Yohannons filed a motion for pre-judgment interest. On November 25, 1987, Raymark filed alternate motions for judgment n.o.v. and a new trial and also filed a motion to alter or amend the judgment.

This appeal was originally argued on October 19, 1988. Before decision, an involuntary bankruptcy petition was filed against Raymark in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The bankruptcy court assumed jurisdiction over Raymark's affairs in a Chapter 11 reorganization proceeding. Further action by this Court was automatically stayed pursuant to 11 U.S.C.A. § 362 (West 1979 & Supp.1990). On May 31, 1990, the bankruptcy court lifted the stay to permit adjudication of this appeal. Following supplemental briefing on intervening developments in the law relating to pre-judgment interest and delay damages, the case was reargued on July 12, 1990.

In its appeal, Raymark raises the following arguments for our review: (1) that the district court should have allowed the testimony of a live witness instead of a videotape of that witness's deposition testimony; (2) that the evidence does not support the jury's allocation of forty percent of the Yohannons' damages to Raymark; (3) that the claim for lost wages, past and future, was improperly submitted to the jury; (4) that there was insufficient evidence to support the jury's award for medical expenses; and (5) that Pennsylvania, rather than New Jersey, provides the rule of decision on questions of pre-judgment interest or delay damages.

## II.

### *Factual History*

Under the usual standard, we set forth the facts of this case in the light most favorable to the verdict winners, Robert and Barbara Yohannon. *See Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1034 (3d Cir.1988). According to his testimony at trial, Robert Yohannon began working at DuPont in 1952 as an engineer. App. at 53–54, 56. From 1952 until 1955, he primarily conducted studies of insulation workers. *Id.* at 56–58. During this period, he was exposed to various types of asbestos insulation products, including sections, block, blankets, tape, gaskets and cement. Mr. Yohannon believed that Raymark made both the blankets and tapes. *Id.* at 59, 68. He later remembered another type of Raymark cloth. *Id.* at 298–99. Although these products were used sparingly, he was exposed to them for almost two full days per week. *Id.* at 67–70. Mr. Yohannon further testified that while "the harder insulation," sections and blocks, made more asbestos dust, it was not as fine a dust as the blankets created. *Id.* at 66–67.

In 1955, Mr. Yohannon was promoted to the maintenance department at the Plant. *Id.* at 71. There, his asbestos exposure decreased slightly. *Id.* at 81. Following other promotions, he was moved to different areas. His exposure to asbestos substantially diminished in 1970. *Id.* at 81. It ceased altogether in 1976. *Id.* at 82. Although he planned to work at DuPont until he was sixty-five years old, he voluntarily

retired at age fifty-eight on March 31, 1985, because he experienced continued shortness of breath. This condition began early in the 1980's, and from then on he had trouble performing his job because it required a lot of field work. *Id.* at 242. He claimed that work was a struggle in the last few years. *Id.* When DuPont offered a voluntary retirement program in January of 1985, Mr. Yohannon accepted because of his illness. *Id.* at 244.[1]

Mr. Yohannon's asbestosis was first diagnosed in June of 1984. His medical expert testified that his condition is progressive and will grow worse, *id.* at 163, although there is no evidence that he is suffering from anything other than shortness of breath. He was told to stop smoking, which he did. His earnings prior to accepting DuPont's early retirement offer ranged from $57,280 in 1981 to $64,266 in 1984. He now earns about $6,000 a year for work done for a friend's company, Frangible Discs, and receives a pension from DuPont of $36,000 per year, before taxes. *Id.* at 258.

### III.

#### *Jurisdiction*

The district court had diversity jurisdiction over this action pursuant to 28 U.S.C.A. § 1332 (West 1966). The Yohannons are citizens of Pennsylvania, Raymark is a citizen of Connecticut, and the claim exceeded the then required jurisdictional amount of $10,000. We have appellate jurisdiction over the final order of the district court pursuant to 28 U.S.C.A. § 1291 (West Supp.1990).

### IV.

#### *Standards of Review*

We review the district court's decision to exclude the live testimony of Raymark's witness for abuse of discretion. *See In re Japanese Elec. Prods. Antitrust Litig.,*

723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also* 21 C. Wright & K. Graham, Federal Practice & Procedure § 5037, at 193–95 (1977). If the law of this Circuit permitted any review of sufficiency questions, despite Raymark's failure to renew its Rule 50(a) motion for a directed verdict at the close of all evidence, we would have to determine whether a reasonable jury could find for the Yohannons on the evidence presented. *See Marino v. Ballestas,* 749 F.2d 162 (3d Cir.1984). Finally, although we normally review the district court's assessment of pre-judgment interest for abuse of discretion, *see Feather v. United Mine Workers of America,* 711 F.2d 530, 540 (3d Cir.1983), in this case we exercise plenary review over which state's law governs that assessment, as well as the availability of pre-judgment interest under that law and the constitutionality of its imposition in this particular case, because these are questions of law, *see Dent v. Cunningham,* 786 F.2d 173, 175 (3d Cir.1986). We will discuss each of Raymark's issues individually, first taking the issues relating to John Hawkins's excluded testimony, then reviewing the various sufficiency issues and conclude with a discussion of the issues relating to pre-judgment interest.

### V.

#### *The Excluded Testimony*

At trial, Raymark attempted to show that DuPont did not use a lot of Raymark materials and that therefore Mr. Yohannon's exposure to Raymark asbestos-containing materials was minimal. A reasonable jury could have determined that such was not the case. Raymark presented Gregory Stagliano (Stagliano), general manager of Delaware Insulation Company, as a witness. Although he testified that the Raymark materials he delivered to Du-

---

**1.** Mr. Yohannon also testified that DuPont offered several incentives to retire in 1984, but because his children's college expenses had depleted his savings, he could not afford to do so at that time. App. at 240. The 1985 retirement incentive gave Mr. Yohannon credit for 38-½ years of employment rather than the 33-½ he actually had. This alleviated certain tax problems the cash bonuses included in earlier programs would have created. *Id.* at 243.

Pont amounted to less than one percent of his company's deliveries to the Plant, App. at 349–50, his company only supplied Raymark materials to DuPont from 1959 to 1966 or 1967, *id.* at 344. He recognized that someone else must have made the deliveries thereafter, *id.* at 354, and that he did not know whether other distribution companies were also supplying Raymark products to DuPont or whether DuPont purchased the products directly from Raymark, *id.* at 354–57.[2] In fact, Mr. Yohannon testified that he remembered a Raymark blanket that was "about an inch and a half, two inches thick, ... and 28, 30 inches, somewhere in that neighborhood, wide," *id.* at 62, while Stagliano told the court that he never stocked any Raymark cloth of that size, nor delivered any to DuPont. Stagliano was certain that the Raymark cloth his company delivered was forty inches wide, one-sixteenth inch thick and fifty yards long and that it contained sixty to eighty percent asbestos.

Following Mr. Yohannon's trial testimony describing the Raymark asbestos blankets, Raymark attempted to introduce the live testimony of John Hawkins (Hawkins), a former Raymark employee. Months before trial, Hawkins videotaped a "generic deposition" discussing Raymark products generally and concluding that they did not emit dangerous amounts of asbestos dust.[3] The Company claims that it did not know that Mr. Yohannon would attribute to it a product it never manufactured, and therefore the videotape did not address the issue of whether Raymark ever made the asbestos blanket Mr. Yohannon described. Mr.

Yohannon was deposed on October 29, 1987, eleven days before trial, and had described a Raymark blanket about one inch thick and two and one-half feet wide. Supplemental Appendix (Supp.App.) at 6–7.

The district court, in a pretrial order, required each party to provide a brief statement of the nature of each witness's testimony. App. at 6. In its pretrial papers, Raymark designated portions of the Hawkins videotaped deposition for use at trial and also identified Hawkins as a possible witness. At trial, the Company indicated that Hawkins was available for live testimony. Raymark did not, however, specify in its pretrial papers, or otherwise give the Yohannons notice, that Hawkins would be called to describe Raymark's particular products. When the Yohannons objected to his live testimony, the district court held a conference in chambers and decided to forbid a live presentation. It concluded that the introduction of such testimony would promote "trial by ambush," and precluded the testimony as violative of "[t]he Federal Rules of Civil Procedure, Local Rules, the standing order concerning asbestos cases, and this court's own pretrial protocol." *Id.* at 664.[4]

On appeal, Raymark contends that the district court should have allowed Hawkins to rebut Mr. Yohannon's testimony identifying the asbestos blankets as Raymark's. The Company argues that Rule 32(a)(3) favors live testimony absent unavailability of the witness or other extenuating circumstances, and that the rule does not give the district court discretion to pre-

---

**2.** Mr. Yohannon testified that he did not remember any company other than Delaware Insulation delivering asbestos products to DuPont, *see* App. at 184–85, but his lack of knowledge could have been due to changing delivery arrangements.

**3.** The record indicates that the parties did not contest the admissibility of that deposition. Raymark planned to use the generic deposition in this and other asbestos cases. The Company explained that "[a] generic deposition was taken because of the magnitude of the asbestos litigation in eastern Pennsylvania and the inevitability that Hawkins would not be available for every trial." Brief for Appellant at 14 n. 5.

**4.** The district court wrote:

[T]he court precluded Hawkins' live testimony regarding product description because defendant Raymark had failed to specify in its pretrial memorandum that Hawkins would be called to testify about that area. Furthermore, Raymark's counsel did not notify plaintiffs' counsel that Hawkins would give live testimony about product descriptions. The Federal Rules of Civil Procedure, Local Rules, the standing order concerning asbestos cases, and this court's own pretrial protocol are designed to prevent trial by ambush. Raymark did not comply with the above rules. Therefore, Raymark should not be heard to complaint [sic] about the preclusion of Hawkins' testimony concerning product descriptions. App. at 664–65.

clude live testimony in favor of a deposition, especially since Raymark was not aware that Mr. Yohannon would testify that Raymark made this blanket until Mr. Yohannon gave his direct examination. Brief for Appellant at 17. Raymark further claims it was unable to confirm this testimony until cross-examination the next day. At that point, the Company contacted Hawkins and did notify the Yohannons that Hawkins would be called to testify. *Id.* In arguing that the exclusion constituted grounds for a new trial, Raymark relies on *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96 (3d Cir.1977).

In *Dudley*, a restaurant employee injured his wrist on an allegedly defective metal table manufactured by South Jersey Metal. Plaintiff's amended complaint alleged negligence by failure to repair or warn, with an additional strict liability claim.

During opening statements at the trial in *Dudley*, counsel for South Jersey Metal told the jury that plaintiff's son cut his wrist on a bracket that supported a table extension and that the extension and bracket were subsequent modifications to the original table South Jersey Metal constructed and delivered. At the close of her case, the plaintiff requested an order pursuant to Federal Rule of Civil Procedure 26(e) precluding South Jersey Metal from introducing evidence about the bracket. The district court granted the motion because South Jersey Metal failed to mention the bracket when it answered plaintiff's discovery interrogatories. The court found that South Jersey Metal had a duty to amend its interrogatories once it learned of the table's alteration. South Jersey Metal argued on appeal that none of its interrogatory answers was inconsistent with the defense; plaintiff simply failed to ask it about the brackets. South Jersey Metal denied deliberately misleading the plaintiff. It claimed it first learned of the alteration on a visit to the restaurant after the pre-trial conference and as plaintiff already had the blueprints for the original table, she was on notice that the extension was a subsequent modification.

On review, we found nothing in the record to show that South Jersey Metal deliberately misled the plaintiff. We held, therefore, that the district court's sanction was too extreme. South Jersey Metal's failure to amend its interrogatory answers was at worst a product of "sheer neglect" and "a lack of professional courtesy." *Dudley*, 555 F.2d at 100. As intention to mislead was lacking and the plaintiff had constructive notice of South Jersey Metal's defense by virtue of the blueprints obtained during discovery, we held that the district court abused its discretion in barring the critical evidence. Accordingly, we reversed and remanded for a new trial.

*Dudley* is not controlling. *Dudley* involved a single, specific product. Since South Jersey Metal delivered the table before the extension was added, it could not be held liable on the theory that it supplied the extension. That is not true in the instant situation. Here, we deal with multiple dangerous products, some of which Raymark supplied. Raymark's own witness, Stagliano, testified that he brought Raymark asbestos products to the Plant where Mr. Yohannon worked, App. at 349–50, but he could not say that he was the sole supplier of asbestos products to DuPont, *id.* at 354. The record contains additional evidence placing Raymark asbestos products at the DuPont site as well.

The district court's action here was not an abuse of discretion. In *Coleco Indus., Inc. v. Berman*, 567 F.2d 569, 576 n. 14 (3d Cir.1977), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978), this Court recognized two crucial factors that made the exclusion in *Dudley* an abuse of discretion: "(1) a lack of willfulness on the part of the defendant whose evidence was excluded, and (2) a contributory neglect by the plaintiff."

The Yohannons were not neglectful in the case at bar. The Company simply misstates the record. Mr. Yohannon first identified the Raymark blanket in his deposition, which occurred eleven days before trial began. The Company should have announced its intention to present more than the videotaped deposition well before trial had begun.

Raymark should not have been surprised by Mr. Yohannon's testimony. Since he

gave the Company notice at his deposition eleven days before the trial began that he would testify about a particular Raymark asbestos blanket, *see* Supp.App. at 6–8, the Company should have decided to call Hawkins before it did and then immediately notified the Yohannons of that intention. Raymark's failure to do so, whether attributable to conscious tactical choice or simple inadvertence, violated the rules. We therefore cannot say that the district court abused its discretion in refusing to permit Raymark to surprise the Yohannons with Hawkins's testimony on a point his videotaped deposition did not cover.

In fact, the *Dudley* decision refers approvingly to the sanctions imposed in *DiGregorio v. First Rediscount Corp.,* 506 F.2d 781 (3d Cir.1974). *DiGregorio* is factually more similar to the case at bar than is *Dudley.* In *DiGregorio,* we "approved the district court's dismissal of an action without a specific finding of willfulness," *Dudley,* 555 F.2d at 100–01, since the district court found a "flagrant disregard both of the general rules of discovery and of a specific court order," *DiGregorio,* 506 F.2d at 788. The district court made the same finding in the instant case. *See* App. at 664. Since Raymark could have and should have asked to use Hawkins's live testimony earlier, in compliance with the district court's pretrial order, Raymark's *Dudley* argument lacks merit. Therefore, we hold the district court acted within its discretion when it decided it would be unfair to permit Raymark to call Hawkins live to rebut Mr. Yohannon's testimony.[5]

### VI.

#### *The Sufficiency Issues*

Three of the issues Raymark raises go to the sufficiency of the evidence supporting the jury's findings on elements of the damage award. On appeal the Company questions the jury's apportionment of liability between tortfeasors, the lack of evidence concerning future earnings, their discount to present value, and the jury's award for future medical expenses. In its initial brief, Raymark sought review of the district court's denial of its motion for a judgment notwithstanding the verdict, or, in the alternative, a new trial. The Yohannons contend in their brief, *see* Brief for Appellees at 26, that Raymark waived the right to judgment n.o.v. when it failed to renew its motion for a directed verdict at the close of all the evidence. In its reply brief the Company limited the relief requested to a new trial and disclaimed any hope for judgment n.o.v.

Raymark only belatedly realized that the failure to move for a directed verdict at the close of all evidence foreclosed it from seeking judgment n.o.v. and instead limited its post-trial and appellate remedies for trial errors to a motion for a new trial. *See Follette v. National Tea Co.,* 460 F.2d 254 (3d Cir.1972) (per curiam). Professors Wright and Miller summarize the law in this respect as follows:

> A motion for judgment notwithstanding the verdict cannot be made unless a motion for directed verdict was made by the party at the close of all the evidence.

*See* 9 C. Wright & A. Miller, Federal Practice & Procedure § 2537, at 596 (1971) (footnote omitted).

The full nature of this procedural problem, however, still escapes Raymark. The Yohannons, although they argue waiver, also fail to see the precise nature of this problem as it relates to sufficiency of the evidence. Professors Wright and Miller go on to say:

---

5. Because we approve the district court action on other grounds, we note, but do not rely upon, two of the Yohannons' other arguments.

The first was that Stagliano presented the same testimony that Hawkins would have, in that he said he never supplied DuPont with a Raymark blanket of the size Mr. Yohannon described. In this example of the "sport of litigation," the Yohannons' argument that Raymark waited until Mr. Yohannon was "locked into" his testimony to introduce a "surprise area of testimony" is inconclusive as to who abused whom. Appellee's Brief at 29.

The second argument presents the *DeMarines* five point test for exclusion of evidence. *See DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201–02 (3d Cir.1978). Although the record could be read to fulfill the elements of the *DeMarines* test, we do not need to rely on it in this instance, since the district court's action is supported on other grounds.

If there have been errors at the trial, duly objected to, dealing with matters other than the sufficiency of the evidence, they may be raised on appeal from the judgment though there has not been a motion either for judgment notwithstanding the verdict or for a new trial, though it is better practice to give the trial court an opportunity to correct its errors in the first instance.

9 C. Wright & A. Miller § 2540, at 611 (footnote omitted).

■ On sufficiency, the failure to move for a directed verdict at the close of all evidence does more than limit an aggrieved party's remedy to a new trial. In this Circuit, it wholly waives the right to mount any post-trial attack on the sufficiency of the evidence. *See Gebhardt v. Wilson Freight Forwarding Co.*, 348 F.2d 129, 132 (3d Cir.1965); *Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 744 (3d Cir.1990); *Follette*, 460 F.2d at 255. *But see Cowger v. Arnold*, 460 F.2d 219, 222 (3d Cir.1972) (stating in dictum without referring to *Gebhardt* that severely limited review would be desirable).

In *Gebhardt*, we stated:

The failure of the defendant to move for a directed verdict against the plaintiff and cross-claimant at the close of all the evidence foreclosed its right to raise on appeal any issue as to the sufficiency of the evidence and also its right to move for judgment notwithstanding the verdict.... The court below may not be held to have erred on an issue which was not properly raised.

*Gebhardt*, 348 F.2d at 132. This holding is directly applicable to the present case.[6]

*Gebhardt* totally forecloses any consideration of sufficiency questions in the absence of a proper motion for a directed verdict. However, as Wright and Miller point out, the strict rule of *Gebhardt* has not been generally accepted. Most other Courts of Appeals have held or said there is an exception to *Gebhardt*'s rule of total foreclosure.[7] Indeed, as Raymark points out, this Court, in *Cowger*, cited with approval the formulation the Court of Appeals for the Second Circuit set out in *Oliveras v. American Export Isbrandtsen Lines*, 431 F.2d 814 (2d Cir.1970).

In *Oliveras*, the court held:

**6.** The Company also cites *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *Beebe v. Highland Tank & Mfg. Co.*, 373 F.2d 886 (3d Cir.), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2115, 18 L.Ed.2d 1350 (1967); *Anderson v. Haas*, 341 F.2d 497 (3d Cir.1965). None of these cases provides direct authority for allowing review of the sufficiency questions in the case at bar.

In *Johnson* and *Anderson* the proponent failed to file a timely judgment n.o.v. motion. In *Beebe* we decided that the trial court had not abused its discretion in ordering plaintiff to pay a remittitur, even though defendant failed to renew its motion for a directed verdict at the close of all the evidence, which prevented the district court from granting the defendant's motion for judgment notwithstanding the verdict.

**7.** The exceptions created by the other circuits can be grouped into three categories: (1) the "manifest injustice" exception, *see Irvin Jacobs & Co. v. Fidelity & Deposit Co.*, 202 F.2d 794, 799 (7th Cir.1953) (noting that "[u]nder well established principles, the sufficiency of the evidence to support the verdict is not preserved for review unless this is one of those exceptional cases which render inapplicable the general rule.") (citations omitted); *United States v. Harrell*, 133 F.2d 504, 507 (8th Cir.1943) (recognizing that "a federal appellate court, in order to

prevent a *manifest miscarriage of justice*, may notice an apparent error not properly raised on the record"); (2) the "no evidence" exception, *see Hinojosa v. City of Terrell*, 834 F.2d 1223, 1228 (5th Cir.1988) (quoting *Stewart v. Thigpen*, 730 F.2d 1002, 1007 (5th Cir.1984)) (holding that "our inquiry is restricted to 'whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in *manifest miscarriage of justice'*") (emphasis in original), *cert. denied*, — U.S. —, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297 (5th Cir. 1978); rule also applies in the Eleventh Circuit, following the principle established in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (in banc) (the Eleventh Circuit adopts Fifth Circuit precedent existing at time of Eleventh Circuit's creation); (3) the "reinterpretation" exception, *see, e.g., Sears v. Pauly*, 261 F.2d 304 (1st Cir.1958) (reinterpreting the sufficiency arguments as an objection to the jury instructions); *Warner v. Kewanee Mach. & Conveyor Co.*, 411 F.2d 1060 (6th Cir.1969) (preserving review of a sufficiency question by reinterpreting the sufficiency issue as an evidentiary problem, which the court found subject to plenary review), *cert. denied*, 398 U.S. 906, 90 S.Ct. 1685, 26 L.Ed.2d 65 (1970).

[W]here the undisputed evidence results in a verdict that is totally without legal support justice requires a new trial despite counsel's failure to move for a directed verdict prior to submission of the case to the jury. To rule that an unintended flaw in procedure bars a deserving litigant from any relief is an unwarranted triumph of form over substance, the kind of triumph which, commonplace enough prior to our more enlightened days, we strive now to avoid whenever possible. The purpose of decisions that refuse to grant relief to those who make procedural mistakes is to deter their commission in future cases and thereby promote the orderly administration of justice. Our decision today does not undermine that objective, for had counsel first moved for a directed verdict and then moved for a verdict n.o.v., he would be entitled to an entry of judgment in his favor. This relief is denied him, but we consider it fair to remand for a new trial on the merits.

*Id.,* 431 F.2d at 817.

As noted, *Cowger* does not mention *Gebhardt,* and its approval of the *Oliveras*

formulation is dicta. *Cowger* was one of those rare cases in which the defendant was liable as a matter of law and the liability issue thus should not have gone to the jury. In *Cowger,* we held that a new trial was appropriate because it was obvious that the jury had misunderstood the judge's negligence charge.

Since *Cowger* did not actually hold there is an exception to *Gebhardt* 's statement that review of sufficiency is totally foreclosed when a directed verdict motion is not renewed, it presents no direct conflict with *Gebhardt.*

In any event, any later decision or statement that conflicts with *Gebhardt* 's holding cannot be relied on.[8]  *Gebhardt* remains the law of this Circuit unless overruled in banc.[9]  *See O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 354 (3d Cir. 1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982).[10]

## VII.

### *Pre–Judgment Interest*

We turn last to Raymark's argument that the assessment of pre-judgment inter-

---

**8.** Internal Operating Procedure 9.1 states:

Policy of Avoiding Intra–Circuit Conflict of Precedent.

It is the tradition of this court that the holding of a panel in a reported opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a published opinion of a previous panel. Court in banc consideration is required to do so.

**9.** On the merits, Raymark questioned the sufficiency of the evidence concerning the percentage of liability assigned by the jury, the evidence on future earnings, including the evidence of both capacity for future employment and reduction to present value, and the evidence on future medical expenses. However, even if the relatively liberal formulation of the exception to the rule of strict foreclosure the Court of Appeals for the Second Circuit set out in *Oliveras* were recognized by an in banc panel of this court, the jury's verdict, even on the medical damages and use of a six percent reduction factor in calculating present worth, does not shock our conscience or lead us to believe that the interests of justice require us to intervene and grant Raymark a new trail despite its procedural default. In particular, Raymark's default relieves us of

the responsibility of deciding whether the decision in *Russell v. City of Wildwood,* 428 F.2d 1176 (3d Cir.1970), no longer controls the sufficiency issue on reduction to present worth because of intervening changes in the governing New Jersey law.

**10.** At least on the surface, to this panel, the rule of total foreclosure seems to be an aberration harking back to the strict rules of common law instead of the spirit expressed in the federal rules that they should be liberally interpreted to do substantial justice. *See, e.g., Oliveras,* 431 F.2d at 817 (discussing rule's harsh effect). It would seem particularly anomalous to allow review of trial errors in discretionary matters such as the admission of evidence in the absence of a proper motion for a directed verdict but at the same time hold that a verdict based on insufficient evidence or even no evidence at all can stand because of procedural default. We discussed this type of procedural deficiency recently in *Keith v. Truck Stops of America,* 909 F.2d 743, 744 (3d Cir.1990) (attorney's affidavit that motion was renewed accepted where record is silent). The problems with the rule are matters for an in banc court or the Advisory Committee on Civil Rules, not this panel.

est, sometimes called delay damages, is controlled by Pennsylvania law. Raymark concedes that Pennsylvania's choice of law rules require application of New Jersey law to issues of liability and basic damages but argues that the Supreme Court of Pennsylvania, presented with the issue, would hold that the award of pre-judgment interest is procedural. Therefore, under the general principles governing choice of law in diversity cases, Raymark reasons that the district court erred in using New Jersey Civil Practice Rule 4:42–11 to compute pre-judgment interest and should have applied Pennsylvania Rule of Civil Procedure 238, which governs pre-judgment interest in Pennsylvania. We agree and will vacate this aspect of the district court's judgment and remand to permit the district court to reevaluate delay damages under Rule 238.

### A.

■ Raymark initially contended that the Yohannons are not entitled to pre-judgment interest. At the time, the Supreme Court of Pennsylvania had suspended as unconstitutional the "mandatory provisions of Rule 238 which assess delay damages against defendants without regard to fault." *Craig v. Magee Memorial Rehabilitation Center,* 512 Pa. 60, 515 A.2d 1350, 1353 (1986). The Yohannons simply argue that our decision in *Salas ex rel. Salas v. Wang,* 846 F.2d 897 (3d Cir.1988), requires the use of New Jersey law on pre-judgment interest whenever New Jersey's substantive law of damages applies.[11] Since we first heard oral argument in this case, our analysis of this issue has been affected by the Supreme Court of Pennsylvania's issuance of a modified Rule 238, replacing the version *Craig* suspended. For this reason, we requested supplemental briefing and reargument on the issue of delay damages. Now, after consideration of all the arguments presented, we hold that Pennsylvania's Rule 238 supplies the rule of decision for this case. The parties have not pressed any federal constitutional issue on the rule's application to this case, and Ray-

mark's argument based on Pennsylvania's state Constitution lacks merit. Therefore, we hold Rule 238 can be used to assess delay damages against Raymark.

### B.

■ In accord with standard doctrine in diversity cases, we first consider whether a Pennsylvania forum would apply Pennsylvania or New Jersey law to assess and determine the amount of pre-judgment interest. This issue is complex and involves subtle analysis of the principles underlying *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), as that case is applied to the forum state's rules on choice of law under *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

As *Erie* and its progeny have held, the substantive, or outcome-determinative law, of the state in which the federal court sits in diversity can be definitively determined only through controlling decisions of the supreme court of that state. Since those courts often do not speak clearly or precisely to the issue in question, a federal court sitting in diversity must often take on the mantle of the soothsayers of old and predict what the supreme court of a particular state would do if it were presented with the issue that controls the case before the federal court. Such contemporary predictions are just as chancy a business as the divination of dreams the heathen kings of ancient biblical lands so often called upon their counselors to interpret in the stories of the Old Testament. Like them, in taking on the task, we hope that our prophecy will find favor in the eyes of the authority that may one day brand it true or false.

The inherently difficult task of predicting what a state supreme court will do when the state's decisional law is unclear on the point at issue is further compounded by the chameleon-like nature of the terms "substantive" and "procedural," which often exchange colors in the context of a particular

---

11. The Yohannons also argue that Raymark did not raise this issue below. We reject that argument because the Company preserved the issue for appellate review in its answer to the Yohannons' Motion for Assessment of Pre-judgment Interest. *See* App. at 656–67.

issue. This compounding difficulty is particularly acute in the field of conflict of laws. Unfortunately, on choice of law issues, all of the labels in *Erie* and its progeny seem to become logically non-determinative. Therefore, examination must go beyond the simple value symbolic logic gives the terms. We turn to that task.

*Erie* holds that a federal court sitting in diversity must apply the law of the forum state to questions that are "substantive" but must use federal rules to govern "procedural" matters. *Erie*, 304 U.S. at 92, 58 S.Ct. at 828. *Klaxon* holds that:

> The conflict of laws rules to be applied by the federal court in [a forum state] must conform to those prevailing in [the forum state's] courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.

*Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021 (footnote omitted). Rules for ascertaining the measure of damages are "matters of substance," *id.* at 495–96, 61 S.Ct. at 1021–22, for *Erie* purposes. The term "substantive" is further defined as "outcome determinative" in *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945).

*Erie* blends a theoretical base in concepts of positive law with an operative justification in the ideal that in our federal system diversity litigants should not be able to get a different outcome by filing their complaint in federal court. Perhaps simplistically, this ideal is summed up in the aphorism that *Erie* is meant to prevent forum shopping.

We begin our own analysis with this Court's holding that "the Pennsylvania law on delay damages in tort, whether awarded under the suspended rule, *Craig* or the present version of Rule 238 is substantive for purposes of *Erie R.R. v. Tompkins.* Therefore, under *Erie*, it must be followed by federal courts sitting in diversity cases." *Fauber v. KEM Transp. & Equip. Co.*, 876 F.2d 327, 328 (3d Cir.1989) (citation omitted); *see also Rosen v. Rucker*, 905 F.2d 702, 705 (3d Cir.1990); *Savarese v.*

*Agriss*, 883 F.2d 1194, 1207 n. 21 (3d Cir. 1989); *Jarvis v. Johnson*, 668 F.2d 740, 741 (3d Cir.1982). Our holding that Rule 238 is substantive follows from our prior determination that "the decision of a federal court to apply or not to apply Rule 238 is 'outcome determinative.'" *Jarvis*, 668 F.2d at 745.

Thus, it appears that a federal court attempting to determine whether Pennsylvania would apply its own rule on pre-judgment damages or that of another state, such as New Jersey, need look only to the principles that the Supreme Court of Pennsylvania has used to decide which state law to apply when the laws of two or more states with some connection to the litigation conflict. Generally, in deciding issues of conflict of laws, Pennsylvania follows a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court," *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796, 805 (1964), as set forth in Restatement (Second) of Conflict of Laws § 6 (1971). *See also Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970); *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966); *McSwain v. McSwain*, 420 Pa. 86, 215 A.2d 677 (1966). These cases show, and the parties concede, that the district court was correct in concluding that the Supreme Court of Pennsylvania would apply New Jersey law to decide "substantive" issues of liability and damages. Nevertheless, the application of New Jersey law to liability and damages does not necessarily control Pennsylvania's choice of law on delay damages. A more searching examination of the Supreme Court of Pennsylvania precedents on delay damages is needed to decide whether that state would follow general choice of law principles in deciding whether to use its own or foreign law on the availability and amount of delay damages.

### C.

Rule 238 was adopted by the Supreme Court of Pennsylvania under its constitutional power to make rules of procedure governing the administration of Pennsylvania's court system and the rules of practice

in the state's courts. *See* Pa. Const. art. 5, § 10.[12] Its purpose was to encourage settlements and reduce a severe backlog of civil cases sounding in tort. *See Jarvis,* 668 F.2d at 745.

From Rule 238's first adoption, the Supreme Court of Pennsylvania has insisted that the imposition of delay damages under Rule 238 is a matter of procedure. *See Laudenberger v. Port Authority,* 496 Pa. 52, 436 A.2d 147, 155 (1981), *appeal dismissed,* 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982). This insistence continues and is reflected in the 1988 changes made in Rule 238 to meet the potential constitutional problems the Supreme Court of Pennsylvania found lurking in the original version of the rule because of its strict application against defendants whose actions had no relation to any delay in payment. *See Craig,* 515 A.2d at 1353. The Supreme Court of Pennsylvania has remained steadfast in its position that Rule 238 is procedural despite strong dissents and concurrences arguing that Rule 238 is not authorized by Article 5, § 10 of the Pennsylvania Constitution because it affects the substantive law of damages.[13]

The Supreme Court of Pennsylvania justifies its conclusion that Rule 238 is procedural, within the meaning of the provisions of that state's constitution that give it power to make procedural rules, by referring to the long delays in resolving civil cases

that plague Pennsylvania's urban and suburban forums and the consequent need to encourage early settlements, particularly in personal injury cases. *See Laudenberger,* 436 A.2d at 150–51. Rule 238 attacks these problems by depriving defendants or their insurers of any incentive to delay settlement so that they, rather than injured persons, can, during the delays, enjoy the income from monies that should have been used to effect a prompt and reasonable settlement of pending cases. *Id.*

Consistent with its wish to remove the incentive for delay and to prevent manipulation of the system by stubborn defendants, the Supreme Court of Pennsylvania has never deviated from its insistence that Rule 238 is procedural. In the face of that persistence, we cannot facilely predict that Pennsylvania's interest-contacts analysis on general choice of law issues will be applied to determine choice of law on issues of delay damages.

Moreover, choosing foreign law on delay damages takes on a different aspect when we consider the effect the rules of states that either prohibit or severely restrict prejudgment interest would have on Rule 238's strong forum protective policy of encouraging settlement. Although Pennsylvania could decide to apply the pre-judgment interest rules of some states but not others, we believe that course is unlikely.[14]

---

**12.** The Supreme Court of Pennsylvania, pursuant to Article 5, § 10 of the Pennsylvania Constitution, has the authority to "prescribe general rules governing practice, procedure and the conduct of all courts ... if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant...." Pa. Const. art. 5, § 10(c).

**13.** As Judge Sloviter noted recently in *Rosen,* 905 F.2d at 705:

The principal post-*Craig* change is the exclusion of the period of time during which plaintiff caused delay of the trial. Pa.R.Civ.P. 238(b)(2). Although there has been much debate in the Pennsylvania courts over the constitutionality of the new rule, *see, e.g., Dietrich v. J.I. Case Co.,* 390 Pa.Super. 475, 568 A.2d 1272, 1280 (1990) (Cirillo, P.J., concurring and dissenting) (rule exceeds rulemaking authority of state supreme court because it "does no consider the fault of both the defendant and the plaintiff"); *Schrock v. Albert Einstein Medical Center,* 386 Pa.Super. 215, 235–36, 562

A.2d 875, 885 (1989) (Cirillo, P.J., dissenting) (rule unconstitutionally punishes defendant in the absence of fault); *Craig,* 512 Pa. at 66–67, 515 A.2d at 1354 (Hutchinson, J., concurring) (rule addresses substantive issues outside court's rulemaking power), the Pennsylvania courts have thus far rejected constitutional attacks. *See, e.g., Shellhamer v. Grey,* 390 Pa.Super. 122, 568 A.2d 224, 228 (1989); *Dietrich,* 568 A.2d at 1279.

**14.** We recognize that reference to the law of some other states concerning delay damages would pose little conflict with the policy behind Rule 238. Indeed, choice of the New Jersey rule, as the district court did here, would have little immediate effect on the policies that underlie Rule 238 because New Jersey has adopted a rule requiring pre-judgment interest that, as does Rule 238, strongly encourages defendants to make prompt and reasonable settlement offers. The New Jersey rule, if anything, is more pro-plaintiff because it supplies a wholly no-

At best, it would cause uncertainty about pre-judgment interest when that outcome depended on choice of law. Individual state judges' perceptions of whether a particular state's rule on pre-judgment interest could be squared with the policies behind Rule 238 would inevitably foster disputes over Rule 238's application and, to that extent, undermine Rule 238's purpose of encouraging settlement. Litigation over a sanction intended to deter litigation is not unknown to the law and it has often adversely affected a sanction's efficacy. *See e.g.*, Note, *Rule 11: Has the Objective Standard Transgressed the Adversary System*, 38 Case W.Res.L.Rev. 279, 281–83 (1987–88) (discussing problems with Rule 11 sanctions).

For the sake of simplicity and clarity, we predict that the Supreme Court of Pennsylvania will forego application of its usual conflicts analysis to determine the rule of decision in the delay damages arena so that state's courts will not have to analyze which other state has contacts and interests sufficient to require application of foreign law on delay damages on a case-by-case basis. Instead, we believe Pennsylvania will adhere to its firm position that Rule 238 is procedural, not only within the meaning of Article 5 § 10 of the Pennsylvania Constitution, but also to resolve the pre-judgment interest rule of decision dilemma in cases with multi-state contacts. In short, we predict that Rule 238 will determine the amount and availability of pre-judgment interest in all cases brought in a Pennsylvania forum.

■ This prediction rejects the superficially appealing analysis that, because Rule 238 is substantive for purposes of the *Erie* doctrine, it is also substantive for choice of law purposes. We think that analysis is shallow for the following reasons. The *Erie* doctrine is meant to insure that diversity cases will have the same outcome, as far as possible, whether they are filed in a state court or a federal court sitting in the territory of that state. Since we predict that the Supreme Court of Pennsylvania would apply Rule 238 to all cases in its

fault rule for application of pre-judgment inter-

courts, *Erie* requires that a federal court sitting in Pennsylvania uniformly apply Rule 238 to determine the amount and availability of pre-judgment interest. Any conflict with our decision in *Jarvis*, 668 F.2d at 748, that Rule 238 is substantive, is only on the surface. More deeply plumbed, the present analysis fits squarely into *Erie*'s underlying philosophical and practical bases. The result that would follow from mechanical application of either the *Klaxon* "substantive" or *Guaranty Trust* "outcome determinative" label does not.

### D.

■ We have predicted that the Supreme Court of Pennsylvania would direct its trial courts to apply Rule 238 uniformly to a determination of pre-judgment interest without regard to its usual rules on choice of law as expressed in *Cipolla*, 267 A.2d 854, and *Griffith*, 203 A.2d 796. Under our ruling in *Fauber*, 876 F.2d at 328, the current version of Rule 238 is applicable to the instant case because "the current version of Rule 238 must be applied to all cases pending on or after November 7, 1988, the date it was promulgated." We must consider, therefore, whether the Yohannons can be awarded any pre-judgment interest under the current version of Pennsylvania Rule 238.

When this case was first argued, new Rule 238 had not yet been adopted. Accordingly Raymark argued that under *Craig*, 515 A.2d at 1353, delay damages could not be awarded against it because the delay in this case was not caused by the defendant's own actions.

In *Craig*, the Supreme Court of Pennsylvania was concerned about the equal protection implications of applying old Rule 238 to cases in which a delay in settlement was caused by the plaintiff's unreasonable action and not by the defendant. It suspended the rule and said:

In making a decision on a plaintiff's entitlement to delay damages the mere length of time between the starting date and the verdict is not to be the sole

est. *See* N.J.Ct.C.P.R. 4:42–11(b).

criterion. The fact finder shall consider: the parties' respective responsibilities in requesting continuances, the parties' compliance with rules of discovery; the respective responsibilities for delay necessitated by the joinder of additional parties; and other pertinent factors.

*Craig*, 515 A.2d at 1353 (footnote omitted).

Raymark originally contended it caused no delay in the pre-trial process and therefore it cannot be held responsible for any pre-judgment interest or delay damages under the principles of Rule 238. This argument has lost much of its force. Since we first heard this case, the Supreme Court of Pennsylvania has adopted a new version of Rule 238.[15] We held in *Fauber*, 876 F.2d at 328, that *Erie* required application of the new version of the rule to any cases pending at its adoption. The new version was designed to cure the problem of unfairness noted in *Craig*. Whether it fully does so remains disputed, but, still, it does ameliorate at least some of the unfairness of the original rule. *See* Note, *The Continuing Debate over Delay Damages: Pennsylvania's New Rule 238*, 35 Vill.L.Rev. 457 (1990) (hereinafter *The Continuing Debate*). Therefore, we reject Raymark's argument based on *Craig*.

### E.

As we have held that Pennsylvania would apply its own rule on delay damages, we must deal with Raymark's constitutional attacks on Rule 238.

Since Raymark did not make a settlement offer that met the requirements of Rule 238, it is liable for pre-judgment interest computed in accord with the version of Rule 238 promulgated on November 7, 1988, unless application of that rule to the circumstances of this case would run afoul of the due process and equal protection concerns expressed in *Craig*, 515 A.2d at 1352–53. We have noted the continuing presence of such concerns under the new version of Rule 238 in our recent opinion in *Rosen*, 905 F.2d at 705. However, at the reargument of this case, counsel for Raymark conceded that the current version of Rule 238 posed no federal constitutional problems on this record and declined to argue that point further. Accordingly, Raymark has waived all federal constitutional issues, and we will not consider them.

On reargument, Raymark did argue that new Rule 238 is unconstitutional under the Pennsylvania Constitution and asked us to predict that the Supreme Court of Pennsyl-

---

**15.** New Rule 238, adopted on November 7, 1988, provides, in pertinent part, that:

(a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial or in the award of arbitrators appointed under section 7361 of the Judicial Code, 42 Pa. C.S. § 7361, and shall become part of the verdict, decision or award.

(2) Damages for delay shall be awarded for the period of time

(i) in an action commenced before August 1, 1989, from the date the plaintiff first filed a complaint or from a date one year after the accrual of the cause of action, whichever is later, up to the date of the award, verdict or decision; or

(ii) in an action commenced on or after August 1, 1989, from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision.

(3) Damages for delay shall be calculated at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded.

(b) The period of time for which damages for delay shall be calculated under subdivision (a)(2) shall exclude the period of time, if any,

(1) after which the defendant has made a written offer of (i) settlement in a specified sum with prompt cash payment to the plaintiff, or (ii) a structured settlement underwritten by a financially responsible entity, and continued that offer in effect for at least ninety days or until commencement of trial, whichever first occurs, which offer was not accepted and the plaintiff did not recover by award, verdict or decision, exclusive of damages for delay, more than 125 percent of either the specified sum or the actual cost of the structured settlement plus any cash payment to the plaintiff; or

(2) during which the plaintiff caused delay of the trial.

Pa.R.Civ.P. 238.

vania would ultimately hold that it lacked power to adopt Rule 238 in its current form because that version of the rule violates the rulemaking authority of the Supreme Court under Pennsylvania Constitution art. 5, § 10. We decline Raymark's invitation. All the Pennsylvania authority that we have uncovered leads us to predict the contrary. *See, e.g., Craig,* 515 A.2d at 1353 (citing *Laudenberger,* 436 A.2d 147). As a matter of first impression, questions might be raised about whether the present version of Rule 238 meets the due process concerns expressed in *Craig* under the Pennsylvania Constitution's analogy to due process. However, the adoption of the new version of the rule by the Supreme Court of Pennsylvania and the decisions of the Superior Court of Pennsylvania interpreting and upholding it lead us to predict that the Supreme Court of Pennsylvania will uphold it as a matter of Pennsylvania constitutional law. *See Rosen,* 905 F.2d at 705, (listing Pennsylvania authority); *The Continuing Debate, supra* (outlining the continuing controversy about new Rule 238).

### F.

In summary, we hold that the present version of Rule 238 is substantive for *Erie* purposes but predict that the Supreme Court of Pennsylvania will hold that it applies to all cases brought in the courts of that state and refuse to apply Pennsylvania's usual choice of law rules to issues of delay damages because of the forum-protective features of the rule. We go on to hold that the current version of the rule applies to this case, that any question as to the constitutionality of its application to this case under the Due Process Clause of the Fourteenth Amendment or otherwise under the United States Constitution is waived and that the decisions of the Supreme Court of Pennsylvania, coupled with strong supporting evidence of state law in the decisions of the Superior Court of Pennsylvania, establish the rule's constitutionality under that state's constitution. Accordingly, on remand, the district court will compute delay damages in this case

under and in accordance with the currently applicable version of Rule 238.

### VIII.

#### Conclusion

For the reasons given above, we will affirm the judgment in the amount of $130,254.80 entered against Raymark on the jury's verdict. We will, however, remand the case to the district court for such further proceedings as are necessary to include delay damages computed in accord with Pennsylvania Rule of Civil Procedure 238.